UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 15-80330-CIV-MARRA

JUDITH PIPINO,

     Plaintiff,

v.

DELTA AIR LINES, INC.,

     Defendant.

_____/

## OPINION AND ORDER

This matter is before the Court on Defendant Delta Air Lines, Inc.'s Motion for Summary Judgment (DE 40). For the following reasons, the motion is granted.

### I. Facts[1]

On April 29, 2013, Plaintiff Judith Pipino was a ticketed passenger on a Delta Airlines, Inc. ("Delta") flight from Burlington, Vermont to Tampa, Florida, with a change of planes at LaGuardia Airport in New York. (DE 57-1 ¶ 3.) Pipino has a history of panic attacks (and other anxiety disorders) and was having panic attacks several times a week for the past month. (DE 57-1 ¶¶ 4–5.) On the night before her flight, Pipino chipped a tooth, leaving it difficult for her to speak clearly. (DE

---

[1] The following facts are undisputed or, where disputed, viewed in the light most favorable to Pipino, the nonmoving party. For brevity, the Court cites only Pipino's response to Delta's statement of facts for a factual proposition where she restates one of Delta's facts and indicates that it is undisputed. The Court notes that Pipino's "additional facts" section of her response to Delta's motion fails to comply with Local Rule 56.1(a), which states: "Additional facts which the party opposing summary judgment contends are material shall be numbered and placed at the end of the opposing party's statement of material facts . . . ." The Court has nevertheless exercised its discretion to consider these additional statements of fact. Ultimately, however, none of these additional alleged facts help Pipino because they are either immaterial or not supported by Pipino's citations to the record (or both).

57-1 ¶ 9.) Also, on the day of her flight, Pipino had a painful blister on her foot. (DE 57-1 ¶ 8.)

On her flight to LaGuardia, which departed at 5:28 p.m. and landed at 7:00 p.m., Pipino drank one glass of wine. (DE 57-2 ¶ 1.) Her next flight to Tampa was scheduled to depart at 7:40 p.m., but it was delayed until 11:00 p.m. (DE 57-2 ¶ 3.) Between 9:30 p.m. and 10:00 p.m., Pipino went to the Delta Sky Lounge. (DE 57-2 ¶ 4.) There, Pipino drank two Johnnie Walker Black scotches and ate a meal. (DE 57-1 ¶ 15; DE 57-2 ¶ 4.) At around 10:45 p.m., after the bartender told Pipino that her plane was boarding, Pipino returned to the departure gate. (DE 57-1 ¶ 16; DE 57-2 ¶ 6.) Pipino does not remember if she paid for her drinks or tipped the bartender. (DE 57-1 ¶ 17.)

When Pipino arrived at the gate counter to board the plane, she engaged in conversation with an elderly woman next to her. (DE 57-1 ¶ 22.) Pipino then noticed that a Delta agent standing behind the counter was staring at her. (DE 57-1 ¶ 22.) Refering to the Delta agent, Pipino said to the elderly woman, "I don't think she likes me too much."(DE 57-1 ¶ 23.) Pipino spoke "with some difficulty due to her broken tooth." (DE 1 ¶ 14.) Pipino admits that her tooth and foot injuries "made her appear inebriated."[2] (DE 1 ¶ 33.)

A second Delta agent, Jackie Tse, asked Pipino to step aside, took her to a nearby seat, and told her that she would not be allowed on the flight because she was "severely inebriated." (DE 57-1

---

[2] Pipino argues that she "did not have enough alcohol over a seven hour period to cause her to be inebriated in the likely view of her Doctor and typical metabolic rates." (DE 57 at 2.) To support this assertion, Pipino cites Dr. Safir Azam's declaration. Pipino fails to cite a specific paragraph of the declaration, but she likely is referring to the paragraph stating: "As a medical doctor, in my professional opinion, 3 drinks over the period of 10 hours will not generally cause intoxication except in certain circumstances . . . ." (DE 57-3 ¶ 7.) This does not support Pipino's assertion. Most significantly, Pipino refers to a "seven hour period" while Dr. Azam refers to "the period of 10 hours." Furthermore, the facts demonstrate that Pipino consumed her drinks over a period of about *five* hours (her flight to LaGuardia, on which she drank her first alcoholic beverage, departed at 5:28 p.m. and she returned to the departure gate at 10:45 p.m.). In any event, as discussed *infra*, whether Pipino was actually intoxicated is immaterial because she admits that she *appeared* intoxicated.

¶¶ 25–26.) Tse smelled alcohol on Pipino, and Pipino admits that it is possible that she smelled of alcohol after drinking three alcoholic beverages. (DE 40-6 at 28:5–15; DE 57-1 ¶ 27.)

After being denied boarding, Pipino felt the symptoms of a panic attack: hyperventilation, heart palpitations, chest pain, trembling, feelings of being detached from surroundings, sweating, dizziness, numbness, hot and cold flashes, and fear of dying or losing control or going crazy. (DE 57-2 ¶ 7.) Pipino was also "grossly insulted" when Tse claimed she was intoxicated. (DE 57-2 ¶ 7.)

Pipino asked Tse for paramedics to be contacted after she was denied boarding, but Pipino is not sure if Tse heard or understood her because she was very upset and could not speak clearly due to her tooth issue. (DE 57-1 ¶ 31.) In any event, Tse did not obtain medical assistance. (DE 57-2 ¶ 8.) According to Pipino, Tse "did nothing other than escort [her] to an area and tell [her] to sit." (DE 57-2 ¶ 8.) Pipino remained in the departure area of the terminal until after midnight, when the airport terminal was closing. (DE 57-1 ¶ 33.) Pipino remained in the departure area because Tse told her to stay there. (DE 40-4 at 161:20–162:9.)

As the airport was closing, a TSA agent told Delta agent Susan Dileo that Pipino was refusing to leave the terminal.[3] (DE 57-1 ¶ 34.) Dileo approached Pipino and told her that the terminal was closing and that she needed to leave the terminal.[4] (DE 57-1 ¶ 35.) At first, Pipino

---

[3] In her response to Delta's statement of facts, Pipino states that she disputes this fact because she "has no idea what these people said to one another." (DE 57-1 ¶ 34.) There is no requirement that all the evidence in support of a motion for summary judgment be within the opposing party's personal knowledge, and Pipino cites no authority for such a requirement. As Delta adequately supports this fact with record evidence, and Pipino fails to raise any evidentiary challenge to Delta's evidence or cite any evidence to rebut this fact, the fact is deemed undisputed for the purpose of this motion. Fed. R. Civ. P. 56(e)(2); S.D. Fla. L.R. 56.1(b).

[4] Pipino asserts this fact is disputed, but again fails to controvert it. Her only dispute is "to the extent that the Delta interrogatories [which Delta cites to support this fact] conflict with the 2013 e mails [sic] *which do not mention Dileo.*" (DE 57-1 ¶ 35) (emphasis added). This dispute lacks merit. Both

refused.[5] (DE 57-1 ¶ 36.) Eventually, after further discussion, Pipino agreed to leave the terminal and

Dileo helped Pipino with her bags.[6] (DE 57-1 ¶ 37.) Either while refusing to move from her initial

seat or while walking toward the terminal exit with Dileo (the exact timing is immaterial), Pipino

told Dileo that she was having a panic attack and requested medical assistance.[7] (DE 57-1 ¶ 38.)

The radio call sign "Delta Tower" is used for the entity that coordinates medical assistance

for Delta passengers.[8] (DE 57-1 ¶ 39.) Dileo radioed Delta Tower, reported that a passenger was

---

emails expressly reference Dileo and discuss her involvement in dealing with Pipino on the night of the incident. (DE 57-6 at 3–4.) As Pipino's only basis for her dispute of this fact is a mischaracterization of the emails, the fact is considered undisputed for the purpose of this motion.

[5] Pipino's dispute of this fact is identical to that discussed in note 4, *supra*, and is similarly rejected.

[6] Pipino asserts that she disputes this fact because she waited for the paramedics. Even if Pipino waited for the paramedics, this does not conflict with Delta's record-supported assertion that, after first refusing to do so, Pipino agreed to leave where she was initially seated and Dileo helped Pipino with her bags. Furthermore, the testimony Pipino cites from her own deposition is consistent with this fact rather than conflicting. (DE 40-4 at 160:20–163:20) (testifying that when the Port Authority police later arrived she was sitting "at another point in the airport" from where Tse initially seated her, that she got to this second point by walking, and that initially she refused to move from where Tse seated her).

[7] Pipino's asserted dispute of this fact is as follows: "Disputed as Pipino testified she was escorted to a new seat and waited there for the paramedics who didn't arrive." (DE 57-1 ¶ 38.) Nothing in this statement is inconsistent with Delta's record-supported factual assertion. In fact, Pipino being escorted to a new seat and waiting for paramedics is wholly *consistent* with Delta's statement that Pipino was walking toward the terminal exit with Dileo and requested medical assistance. Pipino's dispute is inexplicable. The only potential inconsistency between Pipino's cited deposition testimony and Delta's statement of fact (which Pipino does not even raise) is that Pipino testified to requesting paramedics while seated where Tse initially seated her. (DE 40-4 at 161:20–162:9.) This might conflict with Delta's statement that Pipino's request occurred while Pipino was already walking with Dileo. It is possible, however, that Pipino's cited deposition testimony does not conflict with Delta's statement and refers to a request to some other person *before* Dileo arrived. Regardless, even if Pipino's testimony refers to her request to Dileo, it is immaterial whether Pipino requested that Dileo contact paramedics while seated or moments later while walking with Dileo toward the terminal exit.

[8] Pipino's only basis for disputing this fact is that she "has no knowledge." (DE 57-1 ¶ 39.) For the reasons discussed in note 3, *supra*, this is not an adequate basis for disputing a fact in a motion for

having a panic attack, and requested medical assistance.[9] (DE 57-1 ¶ 40.) Delta Tower received the

message and notified the Port Authority.[10] (DE 57-1 ¶ 41.) Tse heard the radio communications and

walked over to assist.[11] (DE 57-1 ¶ 42.) When she arrived, Tse asked Pipino if she was okay and

waited with Pipino and Dileo for the Port Authority officers to arrive.[12] (DE 57-1 ¶ 43.)

Two Port Authority officers arrived. (DE 57-1 ¶ 44.) The officers' presence made Pipino feel

better. (DE 57-1 ¶ 45.) Pipino started to calm down and was able to leave the terminal. (DE 57-1 ¶

---

summary judgment and the fact is deemed undisputed for the purpose of this motion.

[9] Pipino states that she admits this fact only "to the extent a radio call was made to someone." (DE 57-1 ¶ 40.) As Delta adequately supports this fact with record evidence, and Pipino fails to raise any evidentiary challenge to Delta's evidence or cite any evidence to rebut this fact, the fact is deemed undisputed in full for the purpose of this motion.

[10] Pipino's response is: "Neither Admitted nor Disputed, Mrs. Pipino has no knowledge; Admitted to the extent someone made a radio call asking for help." (DE 57-1 ¶ 41.) This response is improper for several reasons. First, Pipino must affirmatively either admit or dispute a statement of fact. Second, the response is internally contradictory as Pipino purports to "neither" admit nor dispute the fact while simultaneously admitting it in part. Third, Pipino having "no knowledge" is not a proper basis for disputing a fact. *See supra* note 3. Finally, Pipino fails to cite any evidence to controvert the fact. As Pipino fails to raise any evidentiary challenge to Delta's evidence or adequately controvert this record-supported fact, the fact is deemed undisputed for the purpose of this motion.

[11] Pipino disputes this fact because "Tse indicated in her deposition she was at another gate, supervising, and then spoke to DiLeo [sic], not Pipino." (DE 57-1 ¶ 42.) She then cites the page of Tse's deposition that Delta cites to support this fact. Pipino's dispute is meritless. It is unclear how Tse being at another gate conflicts with the fact that she heard a conversation over a *radio*. On the cited page of Tse's deposition, Tse clearly testifies that she heard the radio conversation and walked over to the scene. (DE 40-6 at 29:14–18.) As Pipino fails to raise any evidentiary challenge to Delta's evidence or adequately controvert this record-supported fact, the fact is deemed undisputed for the purpose of this motion.

[12] Without explanation, Pipino states she disputes this fact and cites the page of Tse's deposition that Delta cites to support this fact. Again, Pipino's dispute is unsupported. On the cited page, Tse testifies that she asked Pipino if she was okay and waited with Pipino and Dileo for the officers to arrive. (DE 40-6 at 29:14–18.) Nothing on this page or the surrounding pages even arguably supports Pipino's dispute. As Pipino fails to raise any evidentiary challenge to Delta's evidence or adequately controvert this record-supported fact, the fact is deemed undisputed for the purpose of this motion.

45.) When the Port Authority officers arrived, Pipino did not ask them for the paramedics and only

said, "I thought you were the paramedics."[13] (DE 57-1 ¶ 46.) Officer Patrick White asked Pipino if

she wanted medical assistance and Pipino declined, or at least did not respond in the affirmative.[14]

---

[13] Pipino states that she disputes this fact "to the extent this suggests Pipino did no longer want paramedics. She did." (DE 57-1 ¶ 46.) First, this does not dispute the alleged fact. Second, Pipino cites her own deposition testimony and that testimony is contrary to her assertion that she still wanted the paramedics. Pipino's testimony on this issue is as follows:

> Q.      -- did they offer to get paramedics for you?
> A.      They said, "Oh' -- when I said, "I thought you were the paramedics."
>         And they said, "Oh. Did you ask for paramedics?"
>         And I said, "Yes. But where are they?" I said, "I thought you were the paramedics."
>         And then they said -- this is after some time. And then they said, "Do you want the paramedics?"
>         I actually felt better when they were there, because I thought, Oh -- they were nice.
> Q.      Okay. Well, when they said, "Do you want paramedics," to you, what was your response?
> A.      Well, *at that point it was irrelevant* because I was -- had -- I was no longer held by Delta; I could leave.
> Q.      What did you say in response to the police when they asked you if you wanted paramedics?
> A.      I cannot recall my exact words.

(DE 40-4 at 167:2–20) (emphasis added). Regardless of her exact words, Pipino admits she was offered the paramedics and that at that point she thought the paramedics were "irrelevant."

[14] Citing her own deposition testimony, Pipino states she disputes this fact because she "told the PA police she needed paramedics and never said she refused them." (DE 57-1 ¶ 47.) First, this fails to even address the first part of Delta's factual assertion—that the officer asked if she wanted medical assistance. As noted in note 13, *supra*, Pipino admits this in her own deposition. Second, Pipino's own deposition testimony contradicts her statement that she told the police she needed paramedics:

> Q. Well, can you tell us one way or the other if you requested them to call paramedics for you?
> A. The – New York Port Authority?
> Q. Yes, ma'am.
> A . . . . You want to know did I ask them, "Could you please call the paramedics?"
> Q. Or words to that effect, yes.

(DE 57-1 ¶ 47.) The Port Authority officers then told Delta Agents Tse and Dileo that they would help Pipino and that no additional assistance was required of Tse or Dileo.[15]  (DE 57-1 ¶ 48.)

Although Pipino claims to have continued to suffer from "the residual physical symptoms of panic" for several days, (DE 57-2 ¶ 12), she admits that she "did not suffer any physical injury as a result of the incident at LaGuardia."[16] (DE 40-4 at 178:11–18.) Though she did have doctor's visits following the incident, no doctor has ever told Pipino that she suffered any physical injury as a result of the incident at LaGuardia.[17] (DE 40-4 at 178:6–10.) When she visited her doctor a few days later,

_____

A. The only thing that I said to them was, "I thought you were the paramedics."

(DE 40-4 at 168:8–21.) Third, Pipino's statement that she "never said she refused them" is only true because she repeatedly failed to give a clear answer at her deposition as to whether she declined the paramedics when offered and often only said that she does not remember her exact words. Just as she never explicitly testified to refusing the paramedics, she also never testified to accepting Officer White's offer to call the paramedics. Finally, in response to one question, Pipino at least admits that she never responded in the affirmative to the officer's offer to call the paramedics. (DE 40-4 at 168:22–169:2) ("Well, once the conversation turned to that subject of paramedics, is it your testimony there was no conversation between you and them about, 'Yes, please call me the paramedics,' or 'No, it's not necessary'? A. Yes.") Thus, at the very least, it is undisputed that Officer White offered to call the paramedics and Pipino did not accept this offer. It is also undisputed that at this point Pipino thought the paramedics would have been "irrelevant." *See supra* note 13.

[15] Pipino disputes this fact on the ground that she "never heard this conversation and there is nothing in the record that she did." (DE 57-1 ¶ 48.) For the reasons discussed in note 3, *supra*, this is not an adequate basis for disputing a fact in a motion for summary judgment and the fact is deemed undisputed for the purpose of this motion.

[16] Despite this being a direct quote from Pipino's deposition, Pipino states that she disputes this fact "to the extent that Delta employees did touch her when telling her to move." (DE 57-1 ¶ 49.) Without citing any specific page or paragraph number, Pipino then cites her own declaration. This dispute is meritless. First, nowhere in her declaration does Pipino even suggest that anyone touched her. Second, even if Pipino was touched while she was being told to move, this would not conflict with Delta's record-supported statement of fact that Pipino suffered no physical injury as a result of the incident at LaGuardia. Being touched is not a physical injury.

[17] Pipino admitted at her deposition that no doctor  has ever told her that she suffered any physical injury as a result of the incident at LaGuardia. (DE 40-4 at 178:6–10.) Despite her own testimony,

Pipino did have an elevated blood pressure. (DE 40-4 at 174:24–175:10.)

Almost two years later, Pipino filed a one-count complaint for negligence against Delta. (DE 1.) Pipino alleges that Delta was negligent because it breached its duty of care "by disregarding [her] disabled circumstances, panic attack [sic] and thereby fail[ing] to discern that [she] was injured in her mouth and in her foot, which made her appear inebriated, even though she was not inebriated." (DE 1 ¶ 33.) She also alleged that Delta breached its duty to exercise reasonable care for Pipino's safety "by ignoring [Pipino's] repeated requests for medical assistance in the face of what was obviously a passenger in an abnormal state of emotional distress." (DE 1 ¶ 34.)

## II. Legal Standard

The Court may grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). It must do so by "citing to particular parts of materials in the record, including depositions, documents, electronically stored

---

Pipino now claims to dispute this fact "as both Dr. Fuson and Dr. Azam told [her] she suffered a panic attack." (DE 57-1 ¶ 50.) To support this dispute, Pipino cites her declaration and the declaration of Dr. Azam. Once again, Pipino's citations do not support her assertions. Nowhere in her declaration, let alone the specific paragraph she cites, does Pipino ever state that any doctor told her that she had a panic attack. The paragraph she cites only states that she "began to feel the symptoms of a panic attack," (DE 57-2 ¶ 7), which does not support her contention that a doctor told her she had a panic attack. Similarly, nowhere in his declaration does Dr. Azam state that he told Pipino that she had a panic attack. The cited paragraph states: "I prescribed for her atarax to reduce her anxiety." (DE 57-3 ¶ 4.)  A separate paragraph of this declaration, not cited by Pipino, states: "I have reviewed the Declaration filed by Ms. Pipino in this action and can attest that the symptoms of panic that she describes are consistent to those that she reported to me at the time." (DE 57-3 ¶ 5.) Though not even cited by Pipino, the Court notes that even this paragraph does not support the contention that Dr. Azam told Pipino that she suffered a panic attack. And none of the citations even mention Dr. Fuson. In any event, a panic attack is not a "physical injury," so Pipino's dispute would be groundless even if her assertion regarding what doctors told her was supported by evidence.

information, affidavits or declarations, stipulations (including those made for the purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). If the burden of persuasion lies with the nonmovant, summary judgment may be granted where the movant either negates an essential element of the nonmovant's claim or demonstrates to the Court that the nonmovant's evidence is insufficient to establish an essential element of that claim. *Celotex*, 477 U.S. at 331. Any doubt regarding whether a trial is necessary must be resolved in favor of the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

After the movant meets its burden of production, this burden shifts to the nonmovant. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts or materials in the record . . . or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The nonmovant's evidence cannot "consist of conclusory allegations or legal conclusions." *Avirgan v. Hull*, 932 F.2d 1572, 1577 (11th Cir. 1991). Where the nonmovant bears the burden of persuasion, it must produce more than a mere scintilla of evidence supporting its position; "there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990).

### III. Discussion

#### A. Preemption

Delta argues that federal law preempts Pipino's state-law negligence claim to the extent it is based on Delta's refusal to allow Pipino to board the plane. The Supremacy Clause of the Constitution provides that the laws of the United States "shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const.

art. VI, cl. 2. Federal law may preempt state law through "conflict preemption," which "arises in two circumstances: when it is impossible to comply with both federal and state law and when state law stands as an obstacle to achieving the objectives of the federal law." *Cliff v. Payco Gen. Am. Credits, Inc.*, 363 F.3d 1113, 1122 (11th Cir. 2004). "Federal regulations have no less pre-emptive effect than federal statutes." *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982).

Under federal regulations promulgated under the Federal Aviation Act of 1958, "No certificate holder may allow any person to board any of its aircraft if that person *appears* to be intoxicated." 14 C.F.R. § 121.575 (emphasis added).[18] This is a safety regulation. The regulation's use of the word "appears" seems to be based on a considered policy choice to err on the side of caution and overinclusiveness by prohibiting the boarding of even those who appear, but in fact are not, intoxicated. In contrast to the adage underlying our criminal justice system that it is "better that ten guilty persons escape, than that one innocent party suffer," 4 William Blackstone, Commentaries *358, the regulation favors caution over accuracy by requiring ten sober persons who merely appear intoxicated to be denied boarding rather than allowing one intoxicated person to board.

The regulation thus preempts any state law that conflicts with an airline's authority to determine that a person is intoxicated based solely on that person's appearance. At the very least, such a state law would stand as an obstacle to achieving the objective of the federal law: allowing on the spot determinations of intoxication based on appearances alone. The Court thus rejects Pipino's arguments suggesting that Tse or any other Delta employee had a duty to further inquire as to whether Pipino was really inebriated. Regardless of whether she actually was inebriated, Pipino concedes that she *appeared* inebriated. (DE 1 ¶ 33.) Accordingly, even viewing the facts in the light

---

[18] Pipino does not dispute that Delta is a "certificate holder."

10

most favorable to Pipino, federal law required Delta not to allow Pipino to board the plane and any state law to the contrary is preempted under principles of conflict preemption.

Pipino argues that her claim is not preempted to the extent Delta's denial of her boarding privileges was arbitrary or capricious. The authority Pipino cites, however, does not address the federal regulation at issue. *See Adamsons v. Am. Airlines, Inc.*, 444 N.E.2d 21, 25 (1982) (addressing a federal statute "authorizing an air carrier to deny passage to any person 'when, in the opinion of the carrier, such transportation would or might be inimical to safety of flight'"). Nevertheless, while the regulation at issue clearly preempts any claim based on a duty to investigate whether a passenger is intoxicated beyond appearances, the regulation's preemptive effect on a claim that the airline negligently determined that the passenger *appeared* intoxicated is not as clear.

Assuming, without deciding, that Pipino is correct that such a claim is not preempted so long as the airline's determination was arbitrary or capricious (and assuming that Pipino adequately pled such a claim, which is doubtful[19]), Pipino's claim would still fail. When the arbitrary or capricious standard applies, the Court looks only at "the facts and circumstances as known by the decision-maker at the time he formed his opinion and whether or not the opinion and decision were arbitrary or capricious in light of those facts and circumstances." *Ruta v. Delta Airlines, Inc.*, 322 F. Supp. 2d 391, 397 (S.D.N.Y. 2004) (citation omitted). "The facts are not to be tested by any additional information unknown to the decision-maker when the decision was made, but later learned." *Id.* Pipino's concession that she appeared intoxicated forecloses any claim that Delta's determination that she appeared intoxicated was arbitrary or capricious. Furthermore, Tse—the

---

[19] Pipino's claim appears to be based on an allegedly negligent failure to inquire *beyond* her appearances rather than a claim for negligently determining that she appeared intoxicated.

decision-maker—witnessed Pipino have difficulty speaking and smelled alcohol on Pipino. Under these circumstances, Tse's determination that Pipino appeared intoxicated was not arbitrary or capricious as a matter of law. For the reasons discussed *supra*, Pipino's contention that Tse *could have* inquired further is irrelevant.

Accordingly, Delta is entitled to summary judgment to the extent Pipino's claim is based on Delta's refusal to allow Pipino to board the plane.

**B. Impact Rule**

Any other negligence claim that Pipino purports to assert that is not otherwise preempted, including Pipino's claim that Delta negligently failed to obtain medical assistance, fails because it is based solely on emotional or mental damages. In addition to seeking damages for "psychological harm," Pipino seeks damages for "financial harm" in the form of medical expenses to treat her psychological harm, costs of staying in a hotel after not being permitted to board the plane, and costs of making alternative travel arrangements. (DE 1 ¶¶ 35–38.) All of these alleged damages arise from either Delta's refusal to allow Pipino to board the plane or Pipino's claimed emotional distress. The Court has already determined that based on the facts of this case Delta cannot be liable for not allowing Pipino to board the plane. Thus, if Pipino is not entitled to emotional distress damages as a matter of law, she is not entitled to any of the damages she seeks.

The Court agrees with Delta that Florida law's "impact rule" bars any claim Pipino asserts to recover damages for emotional distress caused by Delta's alleged negligence.[20] Florida's version of the impact rule bars a claim for mental or emotional damages caused by a defendant's negligence

---

[20] The parties agree that Florida law governs Pipino's negligence claim, so the Court need not engage in a conflict-of-laws analysis. (DE 40 at 13–15; DE 57 at 5.)

unless (1) the plaintiff sustained a physical impact from an external source, (2) the claim arises from a situation in which the "impact" requirement is relaxed and the plaintiff manifests a significant discernible physical injury or illness as a result of the emotional trauma, or (3) one of the narrow exceptions to the impact rule applies rendering the rule inapplicable. *Accord Fla. Dep't of Corr. v. Abril*, 969 So. 2d 201, 206 (Fla. 2007) (per curiam); *Willis v. Gami Golden Glades, LLC*, 967 So. 2d 846, 850 (Fla. 2007) (per curiam); *Gracey v. Eaker*, 837 So. 2d 348, 355 (Fla. 2002). Pipino's claim for emotional damages does not satisfy any of these criteria.

In *Willis*, the Florida Supreme Court clarified that no physical injury is necessary to overcome the impact rule where the plaintiff sustains "an impact or touching." 967 So. 2d at 850 ("When an impact or touching has occurred *the rule has no application*."). Prior to *Willis*, the Florida Supreme Court often phrased the impact rule as requiring both a physical impact *and* a physical injury: "In essence, the impact rule requires that 'before a plaintiff can recover damages for emotional distress caused by the negligence of another, the emotional distress suffered must flow *from physical injuries* the plaintiff *sustained in an impact*.'" *R.J. v. Humana of Fla., Inc.*, 652 So. 2d 360, 362 (Fla. 1995) (emphasis added); *see also, e.g.*, *S. Baptist Hosp. of Fla., Inc. v. Welker*, 908 So. 2d 317, 320 (Fla. 2005) (per curiam) (quoting *Humana*, 652 So. 2d at 362 ); *Rowell v. Holt*, 850 So. 2d 474, 477–78 (Fla. 2003) (same); *Gracey*, 837 So. 2d at 355 (same). *Willis* rejects *Humana*'s formulation of the impact rule by holding that an impact alone, without any physical injury, satisfies the impact rule. *See Willis*, 967 So. 2d at 850; *id.* at 868–69 & n.11 (Cantero, J., dissenting).[21]

---

[21] Puzzlingly, in a case decided the same day as *Willis* by the same four Justices who constituted the majority in *Willis*, the Florida Supreme Court repeated the *Humana* formulation to describe the impact rule, even though that formulation is irreconcilable with the holding of *Willis*. *See Abril*, 969 So. 2d at 205 (quoting *Humana*, 652 So. 2d at 362). *Abril* does not address *Willis*. Immediately after quoting the *Humana* formulation, however, the *Abril* court contradicts that formulation by stating

Pipino argues that the impact rule does not bar her claim because Delta employees touched her when they moved her from the gate area to a seat and also when they moved her from that seat to another seat. It is true that such touching is a sufficient "impact," as the requisite impact need only be "slight." *Id.* at 850 (majority opinion). "The essence of impact . . . is that the outside force or substance, no matter how large or small, visible or invisible, and no matter that the effects are not immediately deleterious, touch or enter into the plaintiff's body." *Id.* (quoting *Eagle-Picher Indus., Inc. v. Cox*, 481 So.2d 517, 527 (Fla. Dist. Ct. App. 1985)).

The problem with Pipino's argument is that she fails to present evidence that any Delta employee ever touched her. As noted *supra*, in response to Delta's statement of fact that Pipino testified that she "did not suffer any physical injury as a result of the incident at LaGuardia," Pipino responds that she disputes this fact "to the extent that Delta employees did touch her when telling her to move."[22] (DE 57-1 ¶ 49.) Without citing any specific page or paragraph number, Pipino then cites her own declaration. Nowhere in her declaration, however, does Pipino even suggest that anyone touched her.

Similarly, in Pipino's "additional facts" section of her response to Delta's motion for summary judgment, she claims that "she was touched by the employees of Delta on several occasions, when they moved her from the gate area to a seat, and then to another seat." (DE 57 at 3.) Pipino again cites her declaration as support, this time citing a specific paragraph. The paragraph she

---

"[t]he rule actually requires some impact on the plaintiff, *or*, in certain situations, the manifestation of severe emotional distress such as physical injuries or illness." *Id.* (emphasis added). This sentence is consistent with *Willis*.

[22] Even if Pipino was touched, this would not dispute Delta's factual assertion that Pipino did not suffer a physical injury.

cites states: "I spent 3 days in a hotel until I had calmed down enough to attempt to complete my journey home. While I waited, I called my doctors and contacts." (DE 57-2 ¶ 10.) This statement provides no support for Pipino's assertion that Delta employees touched her. As Pipino fails to cite any evidence— including from her own declaration—that any Delta employee touched her, she fails to satisfy the requirement of an "impact."

Citing no authority, Pipino argues that even if she was not touched by Delta employees, she suffered an "internal physical impact" based on her panic attack. The notion of an "internal physical impact" lacks merit. The impact rule requires the impact to come from an *external* source. *See Willis*, 967 So. 2d at 850 (referring to "a physical impact *from an external source*" (emphasis added) (quoting *Cox*, 481 So. 2d at 526)); *id.* ("The essence of impact, then, it seems, is that *the outside force or substance*, no matter how large or small, visible or invisible, and no matter that the effects are not immediately deleterious, touch or enter into the plaintiff's body." (emphasis added) (quoting *Cox*, 481 So. 2d at 527)). The Court thus rejects Pipino's "internal impact" argument.

Having found that Pipino fails to establish that she sustained an impact from an external source, the Court turns to whether she can satisfy the impact rule by demonstrating (1) that her claim arises from a situation in which the "impact" requirement is relaxed and (2) that she manifested some physical injury or illness as a result of the emotional trauma. Originally, Florida law required a plaintiff to sustain a physical impact to recover damages for emotional injuries caused by a defendant's negligence. *See Gilliam v. Stewart*, 291 So. 2d 593, 594–95 (Fla. 1974). Later, the Florida Supreme Court modified the impact rule. This modification allows a plaintiff to recover emotional damages caused by a defendant's negligence in the absence of a physical impact on the plaintiff if the plaintiff suffered "death or significant discernible physical injury, when caused by

psychological trauma resulting from a negligent injury imposed upon a close family member within the sensory perception of the physically injured person." *Champion v. Gray*, 478 So. 2d 17, 18 (Fla. 1985), *receded from in part on other grounds*, *Zell v. Meek*, 665 So. 2d 1048, 1053–54 (Fla. 1995).

It is unlikely that Pipino's claim arises from a situation in which the requirement of an impact is relaxed. It does not appear that *Champion*'s modification of the impact rule extends beyond the bystander situation, where the plaintiff witnesses or otherwise is within the sensory perception of a direct injury to a third party.[23] *Champion* itself was a bystander case. *Id.* at 19 ("There are at least two distinct emotional circumstances: one caused by fear for one's own safety and one caused by anxiety or stress for the injury or death of another. . . . The second is what exists here . . . ."). And the court expressly noted that the modification it created was "limited" to "the factual context of this claim." *Id.* at 18. Furthermore, multiple statements in the opinion suggest that its modification of the impact rule applies only in the context of witnessing an injury to another. *Id.* at 18 (noting that exception applied where the emotional damages resulted "from a negligent injury imposed upon a close family member"); *id.* at 19 (noting factor of "[w]hether plaintiff and the victim were closely related"); *id.* at 20 ("[W]e we are dealing with an unusual and nontraditional cause of action in allowing damages caused by psychic injury following an injury to another . . . ."); *id.* (referring to type of plaintiff to whom the modification applied as "the secondarily injured party"); *id.* ("We hold that a claim exists for damages flowing from a significant discernible physical injury when such injury is caused by psychic trauma resulting from negligent injury imposed on another . . . .").

Cases citing *Champion* also seem to expressly limit it to the bystander context. *See Hagan*

---

[23] Indeed, *Champion* does not entirely displace the impact requirement. While not expressly stated in such terms, *Champion* actually only relaxes the requirement to allow the impact to be sustained by a third party rather than the plaintiff. An impact is nonetheless present in such cases.

*v. Coca-Cola Bottling Co.*, 804 So. 2d 1234, 1237 (Fla. 2001) (explaining that in *Champion* the court "modified the impact rule in bystander cases"); *Zell*, 665 So. 2d at 1054 ("We reaffirm our qualification of the foreseeability test and restate, consistent with *Champion*, the elements required to allege a cause of action for negligent infliction of emotional distress: . . . (3) the plaintiff must be involved in some way in the event causing the negligent injury to another; and (4) the plaintiff must have a close personal relationship to the directly injured person."). Other cases, though not expressly describing a bystander situation, still state that the modification applies only in "certain situations" or "narrowly defined cases." *See Abril*, 969 So. 2d at 206; *Gracey*, 837 So. 2d at 355; *Kush v. Lloyd*, 616 So. 2d 415, 422 (Fla. 1992) (per curiam).

Even assuming *arguendo* that *Champion* can be extended beyond the bystander situation to other situations where the plaintiff manifests a physical injury or illness, as Pipino seems to argue, Pipino would still not be able to take advantage of *Champion*'s modification of the impact rule. Pipino argues that she suffered a physical injury in the form of a panic attack. She claims that she testified that she did not suffer a physical injury because she "understood Defense questioning about a 'physical injury' to be distinguished from a panic attack which produces tangible physical effects," such as hyperventilation and an elevated blood pressure. (DE 57 at 4, 7.)

Pipino's argument fails because panic attacks are not physical injuries; they are "emotional disturbances." *Ledford v. Delta Airlines, Inc.*, 658 F. Supp. 540, 542 (S.D. Fla. 1987) (holding that panic attacks "do not constitute the demonstrable physical injury that must be shown under Florida law").[24] Also, while panic attacks may be manifested by physical symptoms, a physical *symptom* is

---

[24] Pipino appears to concede that panic attacks are not physical injuries. (DE 57 at 4) ("Pipino clearly states she had a panic attack, *but not physical injury*.").

not equivalent to a physical *injury or illness*, let alone a "significant discernible physical injury" as *Champion* requires. 478 So. 2d at 18; *see also Elliott v. Elliott*, 58 So. 3d 878, 882 (Fla. Dist. Ct. App. 2011) ("Here, the ailments complained of are headaches, diabetes, sleep apnea, stress, insomnia, anxiety, loss of appetite, hair loss, and bowel trouble, which are not the sort of the discernable physical injuries discussed in *Champion* and *Zell*."). For example, a manifestation such as elevated blood pressure is physical and arguably discernable, but it is neither significant nor an injury or illness.[25] *Ledford*, 658 F. Supp. at 542 ("Temporary elevation of blood pressure not leading to further complications is not a significant and discernible injury.").[26]

Pipino's claim also does not fall into one of the exceptions in which the impact rule is inapplicable. While Florida law recognizes some exceptions to the impact rule, those exceptions "have been narrowly created and defined in a certain very narrow class of cases." *Rowell*, 850 So. 2d at 478. Pipino suggests that the exception recognized in *Rowell* applies. Without any explanation, Pipino claims that *Rowell* is "directly on point to this case." (DE 57 at 7.) The Court disagrees. In *Rowell*, the Florida Supreme Court held that the impact rule was inapplicable to a legal malpractice claim where the "negligent failure to deliver a document that would have produced the immediate

---

[25] *Champion* only mentions injuries, but it appears illnesses also qualify. *See Abril*, 969 So. 2d at 206; *Kush*, 616 So. 2d at 422.

[26] If physical manifestations alone, as opposed to physical injuries or illnesses, could overcome the impact rule, the discussion in *Willis* regarding whether an impact occurred would have been superfluous. In *Willis*, the plaintiff suffered "physical manifestations" of her emotional injuries including "(1) sexual dysfunction; (2) peripheral temperature changes; (3) muscle tightening; and (4) increased sweat gland activity." 967 So. 2d at 849. Nevertheless, the court addressed whether the impact rule was satisfied despite the lack of a physical injury. This demonstrates that either physical manifestations are insufficient to qualify as physical injuries or, alternatively, that such physical manifestations are sufficient in situations where the impact rule is relaxed but they were not sufficient in *Willis* because it was not a bystander case. Under either explanation for why the physical manifestations were insufficient in *Willis*, it is clear that Pipino's claim fails under the impact rule.

18

release of a pretrial detainee resulted in a protracted period of wrongful pretrial imprisonment with resultant emotional distress." 850 So. 2d at 475–76. *Rowell* has no application to this case. Indeed, the *Rowell* court explained that the case presented "a *unique* factual scenario deserving of an *equally tailored* principle of law." *Id.* at 475 (emphasis added). To the extent Pipino attempts to insinuate that her feeling of being "trapped" in the airport compares to an innocent detainee's wrongful imprisonment for over week, the analogy is unconvincing—to say the least.

Pipino also argues that there is an exception for claims against common carriers, which she contends "need reach only the lower standard of gross insult." (DE 57 at 8.) Pipino cites *Mallock v. Southern Memorial Park, Inc.*, 561 So. 2d 330 (Fla. Dist. Ct. App. 1990), and Restatement (Second) of Torts § 48 (1965). Neither support her argument. *Mallock* did not discuss any "gross insult" standard. More significantly, both *Mallock* and the cited Restatement section address claims for *intentional* infliction of emotional distress, to which the impact rule does not apply. *Welker*, 908 So. 2d at 320; *Mallock*, 561 So. 2d at 332 n.2. Pipino's claim is limited to negligence, to which the rule *does* apply. Accordingly, to the extent Pipino's claims are not preempted, the impact rule bars them.

### IV. Conclusion

Accordingly, it is hereby **ORDERED AND ADJUDGED** that Defendant Delta Air Lines, Inc.'s Motion for Summary Judgment (DE 40) is **GRANTED**. The Court will enter a separate judgment consistent with this order.

**DONE and ORDERED** in Chambers at West Palm Beach, Palm Beach County, Florida this 18th day of July, 2016.

_____
KENNETH A. MARRA
United States District Judge

19